UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :

                 Plaintiff,          : Case No. 1:08-CR-00093-RJL

v.                                 : Hon. Richard J. Leon

John Stagliano,                    :
John Stagliano, Inc., and
Evil Angel Productions, Inc.  :
14141 Covello Street
Van Nuys, CA 91405

---

**DEFENDANT EVIL ANGEL PRODUCTIONS, INC.'S
MOTION TO DISMISS INDICTMENT**

---

Comes now, defendant Evil Angel Productions, Inc. ("E.A. Productions"), by and through undersigned counsel, and respectfully move the Court to dismiss the indictment against it on the following grounds:

1. 18 U.S.C. 1465, which incorporates the "taken as a whole" and "community standards" criteria of *Miller v. California,* is unconstitutional as applied to the World Wide Web;

   **Primary Authorities:** *Miller v. California,* 413 U.S. 15 (1973); *Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997); *Ashcroft v. American Civil Liberties Union,* 535 U.S. 564 (2002); *Ashcroft v. American Civil Liberties Union,* 542 U.S. 656 (2004); *American Civil Liberties Union v. Ashcroft,* 322 F.3d 240 (3d Cir. 2003); *American Civil Liberties Union v. Mukasey,* __ F.3d __, 2008 WL 2801759 (3d Cir. July 22, 2008).

2. 47 U.S.C. 223(d), is a content-based restriction on speech that is presumptively invalid, is not narrowly tailored to advance a compelling government interest, and does not utilize the least restrictive means to accomplish its objective.

   **Primary Authorities:** *Miller v. California,* 413 U.S. 15 (1973); *Reno v. American Civil Liberties Union,* 521

U.S. 844 (1997); *Ashcroft v. American Civil Liberties Union,* 535 U.S. 564 (2002); *Ashcroft v. American Civil Liberties Union,* 542 U.S. 656 (2004); *American Civil Liberties Union v. Ashcroft,* 322 F.3d 240 (3d Cir. 2003); *American Civil Liberties Union v. Mukasey,* __ F.3d __, 2008 WL 2801759 (3d Cir. July 22, 2008).

3.   The federal obscenity statutes (18 U.S.C. 1462; 18 U.S.C. 1465; and 18 U.S.C. 1466) violate the First Amendment and the constitutional guarantee of substantive due process contained in the Fifth and Fourteenth Amendments.

**Primary Authorities:** *Stanley v. Georgia,* 394 U.S. 557 (1969); *Carey v. Population Services International,* 431 U.S. 678 (1977); *Lawrence v. Texas,* 539 U.S. 558 (2003); *Reliable Consultants, Inc. v. Earle,* 517 F.3d 738 (5th Cir. 2008).

4.   Motion to dismiss forfeiture count.

5.   Motion to join all other defendants' motions.

This motion is supported by the following Memorandum of Points and Authorities.

Oral argument is requested.

Respectfully submitted,

/s/ Robert Corn-Revere

Robert Corn-Revere
(D.C. Bar No. 375415)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
Telephone: (202) 973-4200
Telecopier: (202) 973-4499

Paul J. Cambria, Jr.
Roger W. Wilcox, Jr.
Lipsitz Green Scime
Cambria LLP
42 Delaware Avenue
Buffalo, New York 14202
Telephone:  (716) 849-1333
Facsimile:  (716) 855-1580

Counsel for E.A. Productions, Inc.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,


v.                                                        CRIMINAL NO.

                                                          08-093-RJL

JOHN STAGLIANO,

JOHN STAGLIANO, INC.,

EVIL ANGEL PRODUCTIONS, INC.

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

EVIL ANGEL PRODUCTION'S MOTION TO DISMISS


## INTRODUCTION

In this motion, defendant contends that certain federal obscenity laws unconstitutionally burden the rights of American adults to view and use obscene materials in private intimate conduct by banning the transportation of, or engaging in the business of selling or transferring, obscene matter. Evil Angel Productions, Inc. ("E.A. Productions"), in conjunction with John Stagliano and John Stagliano, Inc., are charged in a seven count indictment with various violations of federal obscenity statutes. In particular, E.A. Productions is charged with violating 18 U.S.C. § 1465

by knowingly transporting two allegedly obscene motion pictures in interstate commerce for the purpose of selling and distributing said motion pictures.[1]  (See Counts One and Two).  E. A. Productions is further charged with an additional violation of § 1465 for having "knowingly used an interactive computer service and other facilities and means, in and affecting interstate commerce, for the purpose of distributing obscene matter, that is, a motion-picture trailer identified as "Fetish Fanatic Chapter 5." (See Count Three).

Counts Four and Five of the indictment charge E. A. Productions with violations of 18 U.S.C. § 1462 for having knowingly used an express company or other common carrier to ship the two motion pictures from California to a location in the District of Columbia.  Count Six accuses E. A. Productions of engaging in the business of selling and transferring obscene matter (the two movies and the motion-picture trailer).  Finally, Count Seven charges E. A. Productions with a violation of 47 U.S.C. 223(d) for having allegedly used an interactive computer service to display an obscene image—the motion-picture trailer "Fetish Fanatic Chapter 5"—in a manner available to a person under eighteen years of age.

E. A. Productions contends that (1) 18 U.S.C. 1465 violates the First Amendment, requiring dismissal of Count Three of the indictment; (2) that 47 U.S.C. 223(d) violates the First Amendment, requiring dismissal of Count Seven of the indictment; and (3) that 18 U.S.C. sections 1462, 1465, and 1466 violate the First

---

[1] The motion pictures involved are entitled "Milk Nymphos" and "Storm Squirters 2: Target Practice."

Amendment and the Due Process Clause of the Fifth Amendment, requiring dismissal of Counts One through Six of the indictment.

**I. COUNT THREE OF THE INDICTMENT CHARGING A VIOLATION OF 18 U.S.C. § 1465 SHOULD BE DISMISSED ON THE GROUND THAT THE STATUTE IS UNCONSTITUTIONAL INSOFAR AS THE *MILLER* REQUIREMENT THAT COMMUNITY STANDARDS BE APPLIED AND THAT THE WORK BE "TAKEN AS A WHOLE" CANNOT BE MET IN THE CONTEXT OF MATERIAL ON THE WORLD WIDE WEB**

In *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court set forth its well known standard for determining whether a targeted work is obscene: (1) would the average person, applying contemporary community standards, find that the work, taken as a whole, appeals to the prurient interest; (2) does the work depict or describe, in a patently offensive way, sexual conduct specifically defined by applicable state law; and (3) does the work, taken as a whole, lack serious literary, artistic, political, or scientific value. *Id.* at 24, 93 S.Ct. 2607 (emphasis added). Neither the community standards element nor the "taken as a whole" requirement can be met in a prosecution for online dissemination of alleged obscene material pursuant to 18 U.S.C. § 1465.

**A. Traditional Community Standards Analysis Applied To Web Communications Renders 18 U.S.C. § 1465 Unconstitutionally Overbroad**

In striking down the Communications Decency Act ten years ago, the Supreme Court prophetically observed that application of a community standards criterion to the Internet "means that any communication available to a nationwide audience will be judged by the standards of the community most likely to be offended by the message." *Reno v. ACLU,* 521 U.S. 844, 877-78, 117 S.Ct. 2329 (1997).[2] That statement remains true today with respect to all online communications. The application of local community standards to Web publications under 18 U.S.C. 1465 subjects such communications to an Internet "heckler's veto," and renders the statute unconstitutionally overbroad.

Vacating and remanding the Third Circuit's first opinion affirming the District Court's preliminary injunction against enforcement of the Child Online Protection Act ("COPA") in *Ashcroft v. American Civil Liberties Union,* 217 F.3d 162 (3d Cir. 2000), the Supreme Court continued to recognize the inability of web publishers to limit access to their web sites on a geographic basis. *Ashcroft v. American Civil Liberties Union,* 535 U.S. 564, 575 n.6, 122 S.Ct. 1700 (2002) (*ACLU I*) (pointing out that there was no evidence in the record to disturb the District Court's

---

[2] The contemporary community standards factor applies to both the prurient interest and patent offensiveness prongs of the *Miller* test. *See, e.g., Pope v. Illinois,* 481 U.S. 497, 500, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987).

finding that "once a provider posts its content to the Internet and chooses to make it available to all, it generally cannot prevent that content from entering any geographic community"). This means, necessarily, that federal obscenity laws applied to the Internet force Web publishers to predict and comply with the community standards of the most conservative regions of the United States. Defendant contends that this is a constitutional defect requiring invalidation of obscenity laws, such as 18 U.S.C. § 1465, that are applied to judge the lawfulness of online communications.

Indeed, the majority of the Justices in *ACLU I* recognized that application of geographically-limited community standards in Web obscenity prosecutions poses overbreadth problems. For instance, Justices Kennedy, Souter, and Ginsberg underscored that "[t]he Court of Appeals found that COPA in effect subjects every Internet speaker to the standards of the most puritanical community in the United States. This concern is a real one, but it alone cannot suffice to invalidate COPA without careful examination of the speech and the speakers within the ambit of the Act." 535 U.S. at 593, 122 S.Ct. 1700. Refusing to join Justice Thomas' conclusion that "the Act is narrow enough to render the national variation in community standards unproblematic," *Id.*, the concurring Justices advised that "[i]ndeed, if the District Court correctly construed the statute across its other dimensions, then the variation in community standards might well justify enjoining enforcement of the Act." *Id.*

Justice Breyer concurred in the judgment, but wrote a separate opinion recognizing the problems posed by Internet dissemination:

> To read the statute as adopting the community standards of every locality in the United States would provide the most puritan of communities with a heckler's Internet veto affecting the rest of the Nation. The technical difficulties associated with efforts to confine Internet material to particular geographic areas make the problem particularly serious.

535 U.S. at 590, 122 S.Ct. 1700 (citation omitted). Accordingly, Justice Breyer concluded that "Congress intended the statutory word 'community' to refer to the Nation's adult community taken as a whole, not to geographically separate local areas." *Id.* at 589.

Justice O'Connor similarly favored a national standard:

> I agree with Justice Kennedy that, given Internet speakers' inability to control the geographic location of their audience, expecting them to bear the burden of controlling the recipients of their speech, as we did in *Hamling* and *Sable*, may be entirely too much to ask, and would potentially suppress an inordinate amount of expression. For these reasons, adoption of a national standard is necessary in my view for any reasonable regulation of Internet obscenity.

535 U.S. at 587, 122 S.Ct. 1700 (citation omitted).

Finally, Justice Stevens concluded that the Third Circuit had correctly enjoined COPA. Emphasizing that "communities differ widely in their attitudes toward sex," Justice Stevens concluded that "applying community standards to the Internet will

restrict a substantial amount of protected speech that would not be considered harmful to minors in many communities." 535 U.S. at 611.

On remand, the Third Circuit revisited the community standards issue and concluded that, *inter alia*, COPA's reliance on community standards rendered the Act overbroad. Reiterating its earlier conclusion that "COPA essentially requires that every Web publisher subject to the statute abide by the most restrictive and conservative state's community standards in order to avoid criminal liability," *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 270 (3d Cir. 2003), the court then explained that the community standards element of COPA, along with other provisions of the statute, impermissibly added to the wide range of speech caught up in COPA's net. *Id.*

This portion of the Third Circuit's reasoning remains unaffected by the affirmance of its decision on other grounds (filtering) by the Supreme Court in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) (*ACLU II*). Indeed, the Third Circuit recently revisited this particular issue and concluded that its prior determination of COPA's overbreadth in this regard retains its vitality:

> We also found that "COPA's application of 'community standards' exacerbates these constitutional problems in that it further widens the spectrum of protected speech that COPA affects." We stated that "COPA essentially requires that every Web publisher subject to the statute abide by the most restrictive and conservative state's community standards in order to avoid criminal liability." Finally, we found that there was no available

7

narrowing construction that would make COPA constitutional. These
conclusions bind us here.

*American Civil Liberties Union v. Mukasey,* __ F.3d __, 2008 WL 2801759 (3d
Cir. 7/22/08).

Similarly, 18 U.S.C. § 1465 cannot be constitutionally enforced against Web
publications. The problems of geographic limitation faced by web publishers have
not diminished; it is still not possible to restrict the geographic reach of a
communication placed on the Internet. Consequently, the communications of E.A.
Productions and others are constantly subject to the heckler' Internet veto. Federal
obscenity statutes that apply local community standards to Internet communications
suppress far more speech than necessary or constitutionally permissible and,
therefore, cannot be validly enforced. Accordingly, Count Three of the indictment
charging defendant with knowingly using an interactive computer service for the
purpose of distributing obscene matter (the motion-picture trailer "Fetish Fanatic
Chapter 5") must be dismissed.

### B.  18 U.S.C. 1465 Is Unconstitutional Insofar As The *Miller* Requirement That The Work Be "Taken As A Whole" Cannot Be Met In The Context of Material On The World Wide Web.

As emphasized above, the language of *Miller* plainly requires that, when
considering the issues of prurient appeal and serious literary, artistic, political, or
scientific value, the allegedly obscene material must be "taken as a whole." Indeed,
as far back at *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498

8

(1957), the expansive nature of the jury's investigation into the content and character of the work was recognized. Notably, the trial judge in *Roth* charged the jury that "the books, pictures and circulars must be judged as a whole, in their entire context, and you are not to consider detached or separate portions in reaching a conclusion." *Id.* at 490, 77 S.Ct. 1304. The Supreme Court reiterated the important of context in *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972), when it reversed Kois' conviction for obscenity, finding that photographs and a poem entitled "Sex Poem" were not obscene:

> We find it unnecessary to consider whether the State could constitutionally prohibit the dissemination of the pictures by themselves, because in the context in which they appeared in the newspaper they were rationally related to an article that itself was clearly entitled to the protection of the Fourteenth Amendment
>
> . . .
>
> In this case, considering the poem's content and its placement amid a selection of poems in the interior of a newspaper, we believe that it bears some of the earmarks of an attempt at serious art.

*Id.* at 231, 92 S.Ct. 2245 (citation omitted; emphasis added).

Traditionally, there has been little debate over what constitutes "the whole" for the purposes of the first and third prongs of the *Miller* test. *See, e.g., United States v. Miscellaneous Pornographic Magazines,* 526 F.Supp 460, 466 (N.D. Ill. 1981) (requiring Dutch text in an allegedly obscene publication to be translated so that the jury could evaluate the material as a whole); *United States v. Thevis,* 484 F.2d 1149,

1155-57 (5th Cir. 1973) (six of twelve magazines held not obscene because significant portions of literary matter accompanied pictures that, taken alone, would satisfy the obscenity test); *United States v. Toushin,* 714 F.Supp. 1452, 1460-61 (M.D. Tenn. 1989) (video charged as obscene must be considered in its entirety).  However, when, as in the instant case, only a portion of material available online is to be judged obscene or not, the question of what makes up the work "as a whole" is much more difficult, if not impossible, to answer.

Here, Count Three of the indictment charges E. A. Productions with knowingly using an interactive computer service to distribute an allegedly obscene motion-picture trailer, "Fetish Fanatic Chapter 5."  According to Federal Bureau of Investigation notes, on January 21, 2008, Special Agent Daniel M. Bradley downloaded the trailer, as follows:

> SA Bradley while acting in an undercover capacity in the vicinity of 14[th] Street NW, Washington DC, accessed www.evilangel.com from a wireless network.  SA Bradley accessed www.evilangel.com in an area open to others, and subsequently selected the trailer BELLADONNA'S FETISH FANATIC 5 for download.

> SA Bradley utilized software to record the accessing and successful download of www.evilangel.com and BELLADONNA'S FETISH FANATIC 5.

(Exhibit A).

Notably, the special agent downloaded both the Web site www.evilangel.com and the motion-picture trailer "Belladonna's Fetish Fanatic 5," which was purportedly available on the Web site, but Count Three of the indictment isolates the trailer for prosecution. Accordingly, this case pointedly raises the question: what is the whole of the material for purposes of making the *Miller* first and third prong determinations with respect to the alleged obscenity of the downloaded trailer?

Indeed, this case presents circumstances mirroring Justice Kennedy's concern over how to evaluate Web publications "as a whole" expressed in his concurrence in the judgment in *ACLU I*:

> Likewise, it is essential to answer the vexing question of what it means to evaluate Internet material "as a whole," 47 U.S.C. §§ 231(e)(6)(A), (C), when everything on the Web is connected to everything else. As a general matter, "[t]he artistic merit of a work does not depend on the presence of a single explicit scene . . . [T]he First Amendment requires that redeeming value be judged by considering the work as a whole.

535 U.S. at 600-01, 122 S.Ct. 1700 (citation omitted).

As Justice Kennedy underscored in the concurrence joined by Justices Souter and Ginsburg, "[t]he notion of judging work as a whole is familiar in other media, but more difficult to define on the World Wide Web. It is unclear whether what is to be judged as a whole is a single image on a Web page, a whole Web page, an entire multipage Web site, or an interlocking set of Web sites." *Id.* at 592-93, 122 S.Ct. 1700.

On remand after *ACLU I*, the Third Circuit Court of Appeals addressed what the Child Online Protection Act meant with respect to evaluation of questionable material "as a whole" when determining its prurient appeal to minors. Taking up Justice Kennedy's suggestion that the Court of Appeals "answer the vexing question of what it means to evaluate Internet material 'as a whole,' when everything on the Web is connected to everything else, the Third Circuit concluded that COPA's definition of "harmful material" was very specific: "In light of the particularity and specificity of Congress's language, Congress had to mean that each individual communication, picture, image, exhibit, etc. be deemed 'a whole' by itself in determining whether it appeals to the prurient interests of minors, because that is the unmistakable manner in which the statute is drawn." *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 252 (2003). Contrasting the general First Amendment requirement that a work be judged in context, the Third Circuit observed, "[y]et, here the plain meaning of COPA's text mandates evaluation of an exhibit on the Internet in isolation, rather than in context. As such, COPA's taken 'as a whole" definition surely fails to meet the strictures of the First Amendment." *Id.* at 253.

Count Three of the indictment suffers from a similar defect. Here, the Government has isolated a tiny portion of E. A. Productions' web site, as it is purportedly permitted to do by the express language of that statute, which specifically and narrowly applies to any obscene "book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording,

12

electrical transcription or other article capable of producing sound or any other matter

. . ."  18 U.S.C. 1465.  Consequently, the obscenity statute suffers from the same

constitutional defect that irrevocably tainted COPA:  because the law allows a work to

be judged in isolation and not in context, it cannot meet the fundamental "taken as a

whole" requirement of the First Amendment and *Miller v. California, supra.*

Accordingly, defendant submits that Count Three must be dismissed.

II.     **COUNT SEVEN CHARGING A VIOLATION OF 47 U.S.C.
        SECTION 223(d) MUST BE DISMISSED ON THE GROUND THAT
        THE CHARGED STATUTE VIOLATES THE FIRST
        AMENDMENT.**

      E.A. Productions is charged in Count Seven of the indictment with having

"knowingly used an interactive computer service to display an obscene image, that is,

a motion-picture trailer identified as 'FETISH FANATIC CHAPTER 5," in a manner

available to a person under 18 years of age in violation of Title 47, United States

Code, Sections 223(d) and 2(a).  47 U.S.C. 223(d) provides as follows:

          (d) Sending or displaying offensive material to persons under 18

          Whoever—

          (1)     in interstate or foreign communications knowingly—

(A)   uses an interactive computer service to send to a specific person or persons under 18 years of age, or

(B)   uses any interactive computer service to display in a manner available to a person under 18 years of age,

any comment, request, suggestion, proposal, image or other communication that, is obscene or child pornography, regardless of whether the user of such service placed the call or initiated the communication; or

(2)   knowingly permits any telecommunications facility under such person's control to be used for an activity prohibited by paragraph (1) with the intent that it be used for such activity,

shall be fined under Title 18 or imprisoned not more than two years, or both.

By the terms of Count Seven of the indictment, E.A. Productions is not charged with sending an obscene communication to a specific person under 18 years of age, and it is not charged with sending child pornography to a specific person under the age of 18. Rather, defendant is charged under 47 U.S.C. 223(d)(1)(B) with using an interactive computer service to *display* "an obscene image" in a manner that is "available" to a person under 18 years of age.

E.A. Productions contends that Count Seven must be dismissed insofar as 47 U.S.C. 223(d)(1)(B) violates the First Amendment of the United States Constitution. 47 U.S.C. 223(d) regulates speech based on its content and is, therefore, presumptively invalid and subject to strict scrutiny. *R.A.V. v. City of St. Paul*, 505

14

U.S. 377, 381, 112 S.Ct. 2538 (1992).   The Government bears the burden of establishing that the statute is narrowly tailored to advance a compelling state interest, utilizing least restrictive means to accomplish its goal. *Sable Comm. of Calif. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829 (1989); *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 120 S.Ct. 1878 (2000).  Defendant contends that, even if a compelling government interest is assumed, 47 U.S.C. 223(d)(1)(B) is not narrowly tailored and does not employ the least restrictive means to achieve its goal.

## A.   47 U.S.C. 223(d)(1) Is Not Narrowly Tailored To Advance A Compelling Government Interest

The Communications Decency Act, passed as part of the Telecommunications Act of 1996, originally prohibited in section 223(d) the "'knowin[g]' sending or displaying to a person under 18 of any message 'that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs.'" *Reno v. American Civil Liberties Union,* 521 U.S. 844, 860, 117 S.Ct. 2329 (1997). The Supreme Court struck the statute as unconstitutional, concluding, *inter alia,* that section 223(d)'s patent offensiveness standard was unduly vague. *Reno v. ACLU,* 521 U.S. at 873, 117 S.Ct. 2329.

The Court ultimately concluded that it was persuaded that "the CDA lacks the precision that the First Amendment requires when a statute regulates the content of speech.   In order to deny minors access to potentially harmful speech, the CDA

effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another." *Id.* at 874, 117 S.Ct. 2329.

In 2003, Congress amended 47 U.S.C. section 223(d)(1) to strike out the language found constitutionally inadequate by the *Reno* Court ("in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs"), and inserted "is obscene or child pornography" (so that section 223(d)(1) now applies to "any comment, request, suggestion, proposal, image, or other communication that, is obscene or child pornography . . ."). See Pub.L. 108-21, section 603(2). Defendant submits that section 223(d)(1)(B), as amended, still cannot be constitutionally enforced.

1.    **47 U.S.C. 223(d)(1)(B) Is Not Narrowly Tailored Because It Subjects Internet Communications To The Community Standards Of The Most Restrictive Communities In The Nation.**

Amending 47 U.S.C. 223(d)(1)(B) so that it applies to "obscene" communications simply ensures that "any communication available to a nationwide audience will be judged by the standards of the community most likely to be offended by the message. *Reno v. ACLU,* 521 U.S. at 877-78, 117 S.Ct. 2329. As discussed above, a majority of the Justices in *Ashcroft v. American Civil Liberties Union,* 535 U.S. 564, 122 S.Ct. 1799 (2002), have recognized the overbreadth problem posed by the application of the community standards criteria of *Miller* to Internet communications. Furthermore, the Third Circuit Court of Appeals has specifically

16

found that COPA's reliance on community standards rendered that criminal law regulation of online communications unconstitutionally overbroad. *American Civil Liberties Union v. Ashcroft*, 322 F.3d at 270; *see also, American Civil Liberties Union v. Mukasey*, __ F.3d __, 2008 WL 2801759 (3d Cir. 7/22/08).

Similarly, 47 U.S.C. 223(d)(1)(B) subjects all communications via an interactive computer service—regardless of whether those communications are commercial or non-commercial in nature—to the application of the most restrictive community's standards regarding what is or is not judged obscene. Like COPA, the challenged portion of the CDA, as amended in 2003, forces those who display communications on the Internet to predict the standards of the most conservative community, and then block the access of anyone under the age of 18 to the display of materials that might affront that most conservative community. The statute imposes an insurmountable burden on Internet speakers, thereby chilling far more speech than constitutionally permitted. Accordingly, 47 U.S.C. 223(d)(1)(B) is not narrowly tailored to advance its purported child protection objective.

2.      **47 U.S.C. 223(d)(1)(B) Is Not Narrowly Tailored Insofar As The *Miller* Requirement That The Work Be "Taken As A Whole" Cannot Be Met In The Context Of Material On The Internet.**

As the Supreme Court explained in *Reno v. ACLU*, the *Miller* criteria for determining obscenity work together to "critically limit[] the uncertain sweep of the obscenity definition." 521 U.S. at 873, 117 S.Ct. 2329. A most important element of

determining the obscenity *vel non* of a charged work under the *Miller* standard is judging the work as a whole when deciding whether it appeals to the prurient interest in sex and whether it has serious literary, artistic, political, or scientific value. If the first and third prongs of *Miller* are not determined by taking the work as a whole—as is clearly required by *Roth v. United States, supra*—then the protections that the *Reno* Court underscored as critical to limiting the "uncertain sweep" of the obscenity definition do not exist and the challenged statute cannot be said to be narrowly tailored.

47 U.S.C. 223(d)(1)(B) suffers from the same defect as COPA: it allows a work to be judged in isolation instead of being taken as a whole. As Justice Kennedy pointed out in *ACLU I*, the "vexing question" of what it means to evaluate Internet material as a whole "when everything on the Web is connected to everything else," must be answered, and the answer in this case, as with COPA, is that Congress's specific listing of communications affected by 47 U.S.C. 223(d)(1)(B) does not require that the communication at issue be judged in its entire context.

In *American Civil Liberties Union v. Ashcroft,* the Third Circuit emphasized that the plain meaning of COPA's text meant that "each individual communication, picture, image, exhibit, etc. be deemed 'a whole' by itself in determining whether it appeals to the prurient interests of minors, because that is the unmistakable manner in which the statute is drawn." 322 F.3d at 252-53. Similarly, 47 U.S.C. 223(d)(1)(B) applies to each individual "comment, request, suggestion, proposal, image, or other

18

communication" that is obscene.   The plain meaning of the statute allows the Government to prosecute the display of a single image of a Web site, or, as in this case, a single video clip displayed on a Web site—regardless of the context in which it is presented.   The result is an overbroad statute that increases the sweep of the obscenity proscription by permitting the charged Internet display to be judged in isolation rather than in its entire context—a context that could very well demonstrate that the material overall does not appeal to the prurient interest or does, in fact, have serious literary, artistic, political, or scientific value.   Consequently, it cannot be said that 47 U.S.C. 223(d)(1)(B) is narrowly tailored.

### 3.  47 U.S.C. 223 (d) (1) (B) Does Not Employ The Least Restrictive Means To Serve the Government's Interest.

Like COPA, 47 U.S.C. 223(d) (1) (B) places the burden to block minors' access to proscribed images on the Web publisher.  In particular, 47 U.S.C. 223 (e) (5) puts the onus on Web publishers to avoid conviction by either (a) taking "reasonable, effective and appropriate actions under the circumstances to restrict or prevent access by minors to a communication specified in [subsection (d)], which may involve any appropriate measures to restrict minors from such communications, including any method which is feasible under available technology "or (b) by "restrict[ing]access to such communication by requiring use of a verified credit card, debit account, adult access code, or adult personal identification number. "47 U.S.C. 227 (e) (5) (A) and (B).  E. A. Productions submits that the recent line of COPA decisions make clear that a less restrictive, more

19

effective means exists to accomplish the goal of protecting minors: the use of filtering technology currently available to Internet users.

In *American Civil Liberties Union v. Aschcroft*, 332 F. 3d 240, the Third Circuit Court of Appeals considered an almost identical set of affirmative defenses in COPA, which allows a Web publisher to avoid conviction (but not prosecution) if it "has restricted access by minors to material that is harmful to minors – (A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under existing technology." 47 U.S.C. 231 (c) (1). The Court of Appeals concluded that COPA's affirmative defenses were not narrowly tailored because they would "likely deter many adults from accessing restricted content, because many Web users are simply unwilling to provide identification information in order to gain access to content, especially where the information they wish to access is sensitive or controversial. "Id. at 259 (footnote omitted). The Third Circuit also concluded that the affirmative defenses did not relieve the burden on Web publishers' speech because the defenses did not apply until after prosecution had begun, and required the speaker to prove that his conduct was covered by an affirmative defense. Id. at 260. In contrast, the court noted that Internet filters and parental oversight would be equally, if not more, effective in accomplishing the goal of child protection than COPA and its affirmative defenses. ID. at 264-65.

20

On further appeal to the Supreme Court in *ACLU II,* 542 U.S. 565, 124 Supreme

Court 2783, the Court affirmed the Third Circuit's decision affirming the District Court's

granting of an injunction preliminarily enjoining enforcement of COPA. In *ACLU II,* the

Supreme Court concluded that filters are less restrictive than COPA:

> They impose selective restrictions on speech at the receiving end,
> not universal restrictions at the source. Under a filtering regime, adults
> without children may gain access to speech they have a right to see without
> having to identify themselves or provide their credit card information.
> Even adults with children may obtain access to the same speech on the
> same terms simply by turning off the filter on their home computers.
> Above all, promoting the use of filters does not condemn as criminal any
> category of speech, and so the potential chilling effect is eliminated, or at
> least much diminished. All of these things are true, moreover, regardless of
> how broadly or narrowly the definitions in COPA are construed.

*ACLU II,* 542 U.S. at 667, 124 S. Ct. 2783.

Having established that filters are less restrictive than the burdens on speech

imposed by COPA, the Supreme Court remanded the case to allow the Government an

opportunity to present additional evidence regarding the reliability of filters in light of

changes in Internet technology since the District Court's initial fact-finding in 1999. *Id.*

at 671, 673, 124 S.Ct. 2783. On remand, the District Court made extensive fact-findings

regarding the effectiveness of filters, and concluded that the Government "failed to

successfully defend against the plaintiff's assertion that filter software and the

Government's promotion and support thereof is a less restrictive alternative to COPA."

*American Civil Liberties Union v. Gonzales,* 478 F.Supp.2d 775, 813 (E.D. Pa. 2007).

On further appeal to the Third Circuit, the Court of Appeals agreed with the District

Court's conclusion that filters are less restrictive and more effective than COPA. In particular, the Third Circuit highlighted the District Court's factual finding that COPA's affirmative defenses are "effectively unavailable" because they do not verify age, and that they impose high costs on Web publishers, including those publishers considered within the "heartland" of the statute. *American Civil Liberties Union v. Mukasey, supra.* Further, the Third Circuit reviewed the District Court's extensive findings of fact regarding the availability and effectiveness of filters and determined that (1) filters cover more speech than COPA, (2) are more flexible than COPA, and (3) are highly effective at preventing minors from accessing sexually explicit material on the World Wide Web. *Id.*

E. A. Productions contends that the same result should apply to 47 U.S.C. 223(d)(1)(B). Although the CDA, as amended in 2003, is not identical in coverage to COPA, it is substantially similar in defects. Like COPA, 47 U.S.C. 223(d)(1)(B) is not narrowly tailored by virtue of the overbreadth created by the application of *Miller's* community standard criterion to online communications that cannot be geographically controlled or directed. Further, like COPA, 47 U.S.C. 223(d)(1)(B) is not narrowly tailored because the statute allows the Government to vitiate the "taken as a whole" protection so vital to narrowing the sweep of obscenity laws. 47 U.S.C. 223(d)(1)(B) substantially chills speech by forcing Web publishers to predict and avoid the most restrictive, most conservative community standards in the nation while simultaneously allowing the Government to prosecute material in isolation rather than in its entire context. The result is a regime that burdens far more speech than is necessary to achieve

a goal of child protection, and this overreach is not cured by the availability of costly and ineffective affirmative defenses that do not come into play until the Web publisher is forced to defend himself against a formal prosecution. Accordingly, the availability of less restrictive, more effective filtering technology that does not burden the speech of Web publishers warrants the conclusion that 47 U.S.C. 223(d)(1)(B) does not employ the least restrictive means to achieve its goals and, consequently, the statute cannot survive strict scrutiny.

III.    **In The Alternative, The Court Should Rule That The Material To Be Taken As A Whole Is The Entire Evil Angel Web Site.**

As discussed above, the *Miller* requirement that the charged work be "taken as a whole" when determining the first and third prongs of the obscenity test cannot be met under the plain language of 18 U.S.C. 1465 and 47 U.S.C. 223(d)(1)(B). Both statutes allow the Government to prosecute individual Internet images or video clips without regard to the context in which they are presented. The "taken as a whole" requirement, however, clearly contemplates that the charged material will not be judged in isolation. *Miller v. California, supra; Roth v. United States, supra.* Should the Court decline to grant E.A. Productions' motion to dismiss Counts Three and Seven on the basis of this constitutional defect, defendant respectfully submits that the Court should rule that the material to be taken as a whole for the purpose of this prosecution is the entire Evil Angel Web site in order to ensure that the video clip charged in Counts Three and Seven is judged in context.

23

IV.   18 U.S.C. § 1462 (Using An Express Company or Common Carrier To Transport Obscene Matter In Interstate Commerce), 18 U.S.C. § 1465 (Knowingly Transporting Obscene Matter In Interstate Commerce And Knowingly Using An Interactive Computer Service To Distribute Obscene Matter In Interstate Commerce), And 18 U.S.C. § 1466 (Engaging In A Business Of Selling Or Transferring Obscene Matter) Violate The United States Constitution By Impermissibly Burdening The First And Fifth Amendment Rights Both Of Adults Who Wish To View Obscene Materials In Private And Of Adults Who Wish To Distribute Such Expressive Materials To Willing Adult Recipients.

E.  A. Productions contends that it may lawfully distribute obscenity through secure channels, and that this right derives from at least two constitutional sources that are independent, but converge to protect both the right to possess and the right to distribute even materials that are obscene.   The First Amendment requires the narrowest exclusion of speech from the realm of protected expression, while the substantive rights afforded by the Fifth Amendment's Due Process Clause allow for the private use of obscene material in a person's intimate activities.

### A. American Citizens May Lawfully Possess And Enjoy Obscene Materials In Private.

A person may lawfully possess sexually explicit materials—including materials that are actually obscene or alleged to be—for viewing in private.  *See, Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243 (1969).  In *Stanley*, the defendant asserted "the right to read or observe what he pleases—the right to satisfy his

intellectual and emotional needs in the privacy of his own home." *Id.* at 565, 89 S.Ct. 1243. The Supreme Court agreed with Stanley's assertion of those privacy rights:

> But we think that mere categorization of these films as "obscene" is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourteenth Amendments. Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.

*Id.*

The *Stanley* Court also rejected Georgia's contention that the state possessed "the right to protect the individual's mind from the effects of obscenity":

> We are not certain that this argument amounts to anything more than the assertion that the State has the right to control the moral content of a person's thoughts. To some, this may be a noble purpose, but it is wholly inconsistent with the philosophy of the First Amendment . . . Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.

*Id.* at 565-66, 89 S.Ct. 1243.

As Judge Harlan explained, *Stanley's* "right to receive" guarantees "a right to a protective zone ensuring the freedom of a man's inner life, be it rich or sordid." *United States v. Reidel*, 402 U.S. 351, 359-60, 91 S.Ct. 1410 (1971) (Harlan, J., concurring) (citation omitted). E. A. Productions contends that, given very significant developments in American privacy law, *Stanley's* "right to receive" now necessarily encompasses the right of E. A. Productions to distribute even allegedly obscene materials to willing adult recipients.

### B. American Adults Enjoy A Constitutionally-Protected Right To Sexual Privacy Under The Due Process Clause.

In 2003, the Supreme Court reaffirmed *Stanley's* lesson that individual liberty interests are, in certain important respects, shielded from State interference, particularly where privacy concerns are implicated.

Justice Kennedy, writing for the Court in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472 (2003), observed:

> Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct.

26

*Id.* at 562, 123 S. Ct. 2472 (emphasis added).  The *Lawrence* Court ultimately ruled that Texas's consensual sodomy law unconstitutionally infringed on substantive due process rights, in a decision that continued a doctrinal history of expanding such personal rights.

Prior to *Lawrence*, the Supreme Court used substantive due process grounds to strike down numerous state laws that restricted or prohibited personal liberties.  For instance, in *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625 (1923), the Supreme Court found that the Due Process Clause of the Fourteenth Amendment protected the right of a parent to control the education of his or her children.  Similarly, in *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571 (1925), the Court upheld on due process grounds the rights of parents to provide their children with a private education in the face of the Oregon Compulsory Education Act.  The right to marry and procreate was found to be fundamental under the Fourteenth Amendment in *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 62 S.Ct. 1110 (1942).

In *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205 (1952), the Supreme Court concluded that involuntary stomach pumping violated the petitioner's right to bodily privacy under the Fourteenth Amendment.  The right to marital privacy and the use of contraceptives within marriage was found to be guaranteed by the Fourteenth Amendment in *Griswold v. Connecticut,* 381 U.S. 479, 483, 85 S.Ct. 1678 (1965)

(observing that the "right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read, and freedom of inquiry, freedom of thought . . .").

In *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817 (1967), the Court struck down a law restricting the rights of persons to enter into interracial marriages on equal protection and due process grounds under the Fourteenth Amendment. In *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029 (1972), the Supreme Court concluded that the Fourteenth Amendment protected the rights of single persons to obtain and use contraceptives. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705 (1973), guaranteed the right to an abortion under the Due Process Clause of the Fourteenth Amendment; *see also, Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 791 (1992). In *Cruzan v. Dir., Mo. Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841 (1990), the Supreme Court determined that a competent person has a Fourteenth Amendment right to refuse unwanted medical treatment.

Continuing this tradition of protecting personal liberty interests under the Due Process Clause, in *Lawrence v. Texas, supra,* the Supreme Court rejected the constitutionality of Texas' law criminalizing consensual sodomy between individuals of the same sex. Five Justices in *Lawrence* construed the Due Process Clause of the Fourteenth Amendment to provide substantive protection to private sexual choices made by adult citizens:

28

The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. **Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government.** "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

*Id.* at 578, 123 S. Ct. 2472 (citation omitted; emphasis added). Likewise, the instant charges of violating 18 U.S.C. §§ 1462, 1465, and 1466 do not involve minors, do not involve persons who might be coerced or injured, and do not involve public sexual conduct or prostitution. Rather these charges relate to communication of adult-oriented expression voluntarily made by adults for willing adult viewers.

Expressly overruling *Bowers v. Hardwick*, 478 U.S. 186, 106 S. Ct. 2841 (1986), the *Lawrence* Court recognized both the liberalization of American society's attitude toward the private sexual choices of its citizens, as well as the judicial

extension of constitutional due process protections to those choices. From the rights to privacy acknowledged in *Griswold v. Connecticut,* 381 U.S. 479, 855 S. Ct. 1678 (1965) (invalidating a state law prohibiting the use of contraceptive drugs and devices), and *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S. Ct. 1029 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"), to *Planned Parenthood of Southern Pa. v. Casey,* 505 U.S. 833, 112 S. Ct. 2791 (1992) (reaffirming *Roe v. Wade,* 410 U.S. 113, 93 S. Ct. 705 (1973), in part, on the due process protections of the Fourteenth Amendment), the *Lawrence* Court tracked the expansion of personal privacy rights recognized by the Supreme Court.

The *Lawrence* Court also noted that the recognition of personal privacy rights with respect to sexual choices may conflict with ethical, moral, and religious beliefs, but warned that the State may not use the criminal law to enforce those beliefs on the society as a whole. In doing so, the Court emphasized that Justice Steven's dissenting opinion in *Bowers* controlled in *Lawrence*:

> "Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by

> married persons, concerning the intimacies of their physical
> relationship, even when not intended to produce offspring, are a
> form of 'liberty' protected by the Due Process Clause of the
> Fourteenth Amendment.  Moreover, this protection extends to
> intimate choices by unmarried as well as married persons."

*Lawrence v. Texas,* 539 U.S. at 577-78, 123 S. Ct. 2472, *quoting Bowers v.
Hardwick,* 478 U.S. at 216, 106 S. Ct. 2841 (Stevens, J., dissenting; footnotes and
citations omitted).

*Lawrence* logically must be construed to ensure protection of an adult's
substantive due process right to make personal choices concerning the purchase and
enjoyment of materials used in relation to those marital choices.  Indeed, Justice
Antonin Scalia declared as much in his dissent in *Lawrence*, where he observed that
the Court's adoption of Justice Steven's  dissent in *Bowers* with respect to *not*
criminalizing certain personal sexual choices would effectively obliterate
Government regulation of private sexual conduct on the basis of moral conceptions,
including obscenity:

> This effectively decrees the end to all morals legislation.  If, as
> the Court asserts, the promotion of majoritarian sexual morality
> is not even a *legitimate* state interest, none of the above-
> mentioned laws can survive rational basis review.

*Id.* at 599, 123 S. Ct. 2472.

Justice Scalia's prediction concerning the effect of *Lawrence* on obscenity laws is not that pronounced of a departure from current law.  The High Court long ago ruled that, under the First and Fourteenth Amendments, the Government may not "tell [ ] a man, sitting alone in his own house, what books he may read or what films he may watch" even if such works are obscene as a matter of law.  *Stanley v. Georgia,* 394 U.S. at 559, 89 S. Ct. 1243.

*Stanley* and *Lawrence* bookend almost forty years of Supreme Court precedent establishing with certainty the rights of an adult citizen in the United States to enjoy intimate activities and sexually explicit materials—even obscene materials—in private.  These rights are grounded in both the First Amendment and in the Due Process Clause of the Fifth Amendment.

**C. The Prohibitions Of Transporting, Transporting By Common Carrier Or By Interactive Computer Service, And Engaging In The Business Of Selling And Transferring Obscene Materials, Unconstitutionally Burden The Exercise Of Free Speech And Due Process Rights By Adults Who Wish To Possess And Use Such Materials In The Privacy Of Their Own Homes.**

The Due Process Clause protects defendant's right to distribute obscene material to adults for viewing and use in private.  *Stanley* determined that it is lawful under the First and Fourteenth Amendments for American citizens to possess and view obscene materials in private.  *Lawrence* established that it is lawful under the Due Process Clause of the Fourteenth Amendment for American citizens to engage in

32

the private, sexual conduct of their choosing without unwarranted government intrusion.

Defendant contends that, consequently, it is entirely lawful for it to engage in the business of selling, transferring, and transporting sexually explicit materials—even obscene materials—to American citizens who wish to view such materials in private and, possibly, utilize such materials in their private, sexual conduct. Defendant further contends that 18 U.S.C. §§ 1462, 1465, and 1466 unduly burden the exercise of adults' First Amendment and Fifth Amendment rights by impermissibly restricting access to sexually explicit materials that they have a right to possess and enjoy.

E.A. Productions has derivative standing to challenge the constitutionality of 18 U.S.C. §§ 1462, 1465, and 1466.    See, e.g., *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010 (1977) (where the Supreme Court held that seller of contraceptives had standing to challenge New York statute prohibiting distribution of contraceptives to anyone under the age of sixteen); *see also, United States v. Extreme Associates,* 431 F.3d 150, 155 (3d Cir. 2005).  Defendant contends that its adult patrons enjoy not only the First Amendment right to possess and view obscene materials within the home, but also the right to use obscene expressive materials as they see fit during private intimate conduct, notwithstanding the holdings of *United States v. Reidel, supra,* and related cases.    The Fifth Amendment

substantive due process right to utilize obscene materials as defendant's adult patrons deem appropriate during private intimate conduct is impermissibly burdened by these obscenity statutes.

The Fifth Circuit Court of Appeals recently concluded that *Lawrence v. Texas, supra,* mandated that Texas's ban on the distribution of sexual devices be struck down on the ground that the distribution prohibition was a public morality law that could no longer be upheld after *Lawrence. Reliable Consultants, Inc., v. Earle,* ____F. 3d. ____ (5th Cir., February 12, 2008). ("Thus, if in *Lawrence* public morality was an insufficient justification for a law that restricted 'adult consensual intimacy in the home,' then public morality also cannot serve as a rational basis for the Texas statute, which also regulates private sexual intimacy.").

Further, the *Reliable Consultants* court concluded that the prohibition of the sale of sexual devices "heavily burdened" the individual's substantive due process right to engage in private intimate conduct of his or her choosing:

> Contrary to the district court's conclusion, we hold that the Texas law burdens this constitutional right. An individual who wants to legally use a safe sexual device during private intimate moments alone or with another is unable to legally purchase a device in Texas, which heavily burdens a constitutional right. This conclusion is consistent with the decision in *Cary* and *Griswold,* where the Court held that restricting commercial

34

transactions unconstitutionally burdened the exercise of
individual rights.

Similarly, in the instant case, 18 U.S.C. §§ 1462, 1465, and 1466 heavily and
impermissibly burden the individual's right not only to possess obscene materials in
private, but also to use allegedly materials in private intimate conduct of his or her
own choosing.

Furthermore, older decisions prohibiting commerce in actually obscene
materials should no longer be considered controlling on the subject. For instance, in
the 1971 decision in *United States v. Reidel, supra,* the Supreme Court "negated the
idea that some zone of constitutionally protected privacy follows such material when
it is moved outside the home area protected by *Stanley.*" *United States v. Orito,* 413
U.S. 139, 141-42, 93 S.Ct. 2674 (1973) (holding that although the Constitution
"extends special safeguards to the privacy of the home, just as it protects other special
privacy rights such as those of marriage, procreation, motherhood, child rearing, and
education," viewing obscene films in commercial theaters open to the public or
transporting such films in interstate commerce "have no claim to such special
consideration"). *See also, Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628
(1973); *United States v. 12 200-Ft. Reels of Super 8mm. Film,* 413 U.S. 123, 93 S.Ct.
2665 (1973). These decisions not only did not foresee the substantive protections
established by *Lawrence* and extended by *Reliable Consultants* to commercial
distribution of sexual devices, they also could not take account of the Internet as a

vehicle for commerce in sexually explicit materials. Defendant further submits that the Third Circuit's decision in *Extreme Associates, supra,* declining to disturb the *Orito/Reidel* rationale is not dispositive of the due process issue raised in this case. In *Extreme Associates,* the Court of Appeals did not rule on the merits of the substantive due process issue before it, believing itself bound by Supreme Court precedent. 431 F.3d at 161. In contrast, the Fifth Circuit had no such problem in *Reliable Consultants, supra,* where it explicitly recognized that *Lawrence* hailed a profound shift in the Supreme Court's jurisprudence regarding substantive due process rights that warranted striking a ban on the sale of devices used by individuals in intimate conduct.

The advent of *Lawrence* certainly was not anticipated in *United States v. Pryba,* 502 F.2d 391 (D.C. Cir. 1974), where the Circuit Court of Appeals affirmed Pryba's conviction on the basis of *Orito,* noting, *inter alia,* that "no constitutionally protected privacy is involved." *Id.* at 405. That statement is simply not true more than thirty years later. Constitutionally-protected privacy interests are, indeed, at stake, and "spatially-bound" limitations on the right to possess even allegedly obscene materials have no bearing in a age where the Supreme Court has declared that the State is not omnipresent in the home "[a]nd there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds." *Lawrence v. Texas, supra* at 562, 123 S.Ct. 2472. *Reidel, Orito, and Pryba* impose spatially-bound restrictions on protected

expressive rights and are irreconcilable with *Lawrence* and its recent progeny, *Reliable Consultants*.

The mere allegation that a work is obscene does not make the targeted speech invisible to the Constitution. As the Supreme Court explained in *R.A.V. v. City of St. Paul, Minnesota,* 505 U.S. 377, 383-84, 112 S.Ct. 2538 (1992) (citations omitted; emphasis in original):

> We have sometimes said that these categories of expression are 'not within the area of constitutionally protected speech,' or that the 'protection of the First Amendment does not extend to them.' Such statements must be taken in context, however, and are no more literally true than is the occasionally repeated shorthand characterizing obscenity 'as not being speech at all.' What they mean is that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content."

This, of course, brings into question the very nature of what is proscribed—in this case, the distribution of allegedly obscene materials and engaging in the business of distributing allegedly obscene materials. The Court's recognition in *R.A.V.* that certain categories of expression can be regulated for some reasons but not for others requires an inquiry into whether the particular restrictions challenged here are appropriately tailored to a constitutionally permissible reason. The Supreme Court

has already ruled that obscenity may be privately possessed, *Stanley v. Georgia, supra,* and that what is obscene as to minors may be sold to adults. *See Ginsberg v. State of New York,* 390 U.S. 629, 88 S.Ct. 1274 (1968). And it has rejected the notion that public morality is a legitimate basis on which the private, intimate activities of consenting adults can be restricted by the Government. *Lawrence v. Texas, supra.* Indeed, more than 35 years ago the Supreme Court refused to accept a corollary premise: that the State of Georgia was empowered to protect an adult American's mind from the effects of obscenity. *See, Stanley v. Georgia, supra* at 566 ("Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts").

Consequently, we are left with two potential reasons for banning the distribution of obscenity: protecting the welfare of children and protecting the interests of adults who have been unwillingly exposed to obscene material. Neither interest is implicated in these charges of violating 18 U.S.C. §§ 1462, 1465, and 1466. Indeed, the protection of child welfare is separately addressed by federal and state statutes prohibiting the dissemination of harmful materials to minors. Further, the potential for exposure of unwilling adults must be assessed in the current context of secure communications with multiple layers of protection of the channels of commerce that carry sexually explicit adult entertainment to so many Americans. Accordingly, there remains no valid basis on which to criminalize the transportation,

transportation by express or common carrier or by interactive computer service, or the engaging in the business of selling or distributing even allegedly obscene materials so long as the expressive materials are directed to willing adult recipients.

### V.  The Court Should Also Dismiss The Forfeiture Count

In the pending indictment, the Government seeks to forfeit various assets owned by E.A. Productions on the grounds that they were used in or constitute the proceeds of obscenity.  Because the federal obscenity statutes and 47 U.S.C. 223(d) are facially unconstitutional and violate defendant's substantive due process rights, the forfeiture count is also invalid and should be dismissed.

### VI.  Motion To Join Other Defense Motions

It is anticipated that E.A. Productions' co-defendants have filed several additional pretrial motions that will be applicable to E.A. Productions.  It would be duplicitous to reproduce each and every pretrial motion which may be applicable to a particular defendant.  Therefore, E.A. Productions hereby moves the Court to permit it to adopt all pretrial motions of the co-defendants that are applicable to E.A. Productions.

### VII.  Conclusion

For the foregoing reasons, and for the reasons set forth by co-defendants John Stagliano and John Stagliano, Inc., the Court should dismiss the pending charges against Evil Angel Productions, Inc. in their entirety.  In the alternative, the Court should rule that the material to be taken as a whole is the entire Evil Angel Web site.

Respectfully submitted,


/s/ Robert Corn-Revere

Robert Corn-Revere
(D.C. Bar No. 375415)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
Telephone:  (202) 973-4200
Telecopier:  (202) 973-4499


Paul J. Cambria, Jr.
Roger W. Wilcox, Jr.
Lipsitz Green Scime Cambria LLP
42 Delaware Avenue
Buffalo, New York  14202
Telephone:  (716) 849-1333
Facsimile:  (716) 855-1580

Counsel for E.A. Productions, Inc.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of July, 2008, a true and correct

copy of the foregoing E.A. Productions, Inc.'s Motion to Dismiss and Memorandum

in Support were served by the Court's electronic filing system upon:

>Pamela A. Satterfield
>U.S. Department of Justice
>Criminal Division
>1301 New York Avenue, NW
>Suite 500
>Washington, DC  20530

>Allan B. Gelbard
>15760 Ventura Boulevard
>Suite 801
>Encino, CA  91436

and by electronic mail upon:

>Jennifer M. Kinsley
>H. Louis Sirkin
>SIRKIN PINALES & SCHWARTZ LLP
>105 West Fourth Street
>Suite 920
>Cincinnati, OH 45202

>/s/ Robert Corn-Revere

FD-302 (Rev. 10-6-95)

EXHIBIT A    CRIMINAL NUMBER 08-093-RJL

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/22/2008

On 01/21/2008, SA Daniel M. Bradley conducted the following investigation in Washington DC:

SA Bradley while acting in an undercover capacity in the vicinity of 14th Street NW, Washington DC, accessed www.evilangel.com from a wireless network.  SA Bradley accessed www.evilangel.com in an area open to others, and subsequently selected the trailer BELLADONNA'S FETISH FANATIC 5 for download.

SA Bradley utilized software to record the accessing and successful download of www.evilangel.com and BELLADONNA'S FETISH FANATIC 5.

The downloaded content will be retained as evidence.



Investigation on    01/21/2008    at Washington DC

File #  145B-WF-235725

Date dictated    01/22/2008

by    SA Daniel M. Bradley

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :

     Plaintiff,          : Case No. 1:08-CR-00093-RJL

v.                : Hon. Richard J. Leon

John Stagliano,          :
John Stagliano, Inc.,
Evil Angel Productions, Inc.   :

---

**PROPOSED ORDER WITH RESPECT TO EVIL ANGEL PRODUCTION,
INC.'S MOTION TO DISMISS**

---

This matter having come before the Court on Evil Angel
Productions, Inc.'s ("E.A. Productions") Motion to Dismiss
Indictment, and the Court having considered said motion,
the United States' Opposition thereto, and the entire
record herein, it is hereby ORDERED that:

1. Defendant's motion to dismiss Count Three of the
Indictment charging a violation of 18 U.S.C. 1465
is GRANTED on the ground that the statute violates
the First Amendment as applied to communications on
the World Wide Web;

2. Defendant's motion to dismiss Count Seven of the
Indictment charging a violation of 47 U.S.C. 223(d)
is GRANTED on the ground that the statute violates
the First Amendment as applied to communications on
the World Wide Web;

3. Defendant's motion to dismiss Counts One through
Six of the Indictment is GRANTED on the ground that
the federal obscenity statutes charged therein
violate the First Amendment and the substantive due
process protections of the Fifth and Fourteenth
Amendments;

4. Defendant's motion to dismiss the forfeiture
allegations of the Indictment is GRANTED; and

5. Defendant's motion to join in its co-defendant's
motions to dismiss is GRANTED.

The Indictment (No. 08-00093) against E.A. Productions is hereby dismissed.

So ORDERED.

Dated this _____ day of _____, 2008.

_____
Hon. Richard J. Leon
United States District Court Judge

TO:

Pamela Satterfield, Esq.
United States Department of Justice
1301 New York Avenue NW, Ste. 500
Washington, D.C. 20530

Paul J. Cambria, Jr., Esq.
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue
Buffalo, New York 14202

Roger W. Wilcox, Jr., Esq.
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue
Buffalo, New York 14202

Robert Corn-Revere, Esq.
DAVIS WRIGHT TREMAINE LLP
1500 K Street, NW, Ste. 450
Washington, D.C. 20005

H. Louis Sirkin, Esq.
SIRKIN, PINALES & SCHWARTZ LLP
105 West 4th Street, Ste. 920
Cincinnati, Ohio 45202

Jennifer M. Kinsley, Esq.
SIRKIN, PINALES & SCHWARTZ LLP
105 West 4th Street, Ste. 920
Cincinnati, Ohio 45202

Allan B. Gelbard, Esq.
THE LAW OFFICES OF ALLAN B. GELBARD
15760 Ventura Boulevard, Ste. 801
Encino, California 91436