UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 1:08-CR-00093-RJL |
| v. | : | Judge Leon |
| JOHN STAGLIANO, et al.<br>14141 Covello, Unit 8C<br>Van Nuys, CA 91405, | :<br><br>: | |
| Defendants. | : | |

---

### DEFENDANT JOHN STAGLIANO, INC.'S
### MOTION TO DISMISS INDICTMENT

---

Comes now Defendant, John Stagliano, Inc. ("JS Inc."), by and through the undersigned counsel, and respectfully moves the Court to dismiss the indictment against it on the following grounds:

1.  47 U.S.C. § 223(d) and 18 U.S.C. § 1465, which incorporates the "taken as a whole" and "community standards" elements from *Miller v. California*, are unconstitutional as applied to the World Wide Web.

    **Primary Authorities:** *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997); *Ashcroft v. American Civil Liberties Union* ("*COPA I*"), 535 U.S. 564 (2002); *Ashcroft v. American Civil Liberties Union* ("*COPA II*"), 542 U.S. 656 (2004); *American Civil Liberties Union v. Mukasey* ("*COPA III*"), 2008 WL 2801759 (3d Cir. July 22, 2008).

2.      The federal obscenity statutes (18 U.S.C. §§ 1462, 1465, and 1466) violate the constitutional guarantee of substantive due process contained in the Fifth and Fourteenth Amendments.

**Primary Authorities:** *Lawrence v. Texas*, 539 U.S. 558 (2003); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008).

This motion is supported by the following memorandum.

Respectfully submitted,


    /s/ Robert Corn-Revere
Robert Corn-Revere
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., NW, Suite 200
Washington, DC 20006-3402
Telephone: (202) 973-4200
Telecopier: (202) 973-4499

H. Louis Sirkin (Ohio Bar No. 0024573)
Jennifer M. Kinsley (Ohio Bar No.  0071629)
Sirkin, Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
Telephone: (513) 721-4876
Telecopier: (513) 721-0876

Counsel for Defendant John Stagliano, Inc.

<div align="center">**MEMORANDUM**</div>

**I.    The Court Should Dismiss Counts Three And Seven Of The Indictment On The Grounds That The *Miller* Standards For Obscenity Cannot Be Applied Constitutionally To The World Wide Web.**

**A.    Introduction**

Defendant John Stagliano, Inc. is charged with various obscenity offenses, including one count of knowingly using an interactive computer service to display alleged obscenity and one count of knowingly using an interactive computer service to distribute alleged obscenity. *See* Indictment, p. 2 (count three), p. 3 (count seven); 18 U.S.C. § 1465; 47 U.S.C. § 223(d). These counts should be dismissed because, as observed by both the Supreme Court and the Third Circuit on a number of occasions, the definition of obscenity is unworkable when applied to the Internet and the World Wide Web. Among the constitutional difficulties with the *Miller* standards for obscenity are the requirements: 1) that the material be taken as a whole, an impossible task for computerized content that is entirely interconnected; and 2) that the material be judged by the contemporary community standards of the district of prosecution, equally as implausible a standard when Website operators cannot control the geographic areas in which their material is accessed and viewed. In addition, the federal obscenity statutes employ undefined and overbroad terms, allowing the government to prosecute constitutionally protected expression. 47 U.S.C. § 223(d) and 18 U.S.C. § 1465 are therefore unconstitutional and the resulting charges against JS Inc. should be dismissed.

A brief summary of the circuit and Supreme Court's treatment of online speech regulations is in order. Notably, both of Congress' attempts to regulate computerized content that is harmful or offensive to minors have been invalidated on First Amendment grounds. The first such statute, the Communications Decency Act ("CDA"), which first promulgated 47 U.S.C. § 223(d), suffered

<div align="center">3</div>

a swift and uncomplicated death.  It was declared unconstitutional by the Supreme Court because it applied to constitutionally protected speech and was therefore overbroad.  *See Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997).  Chief among the CDA's deficiencies were its application to broad categories of "indecent" or "patently offensive" material, terms that were undefined in the statute, and its lack of an exclusion for material that contains serious literary, artistic, political, or scientific value as to minors.  *Id*. at 870-71, 865.  Perhaps foreshadowing later concerns, the Court also observed that access to material posted on the World Wide Web cannot be limited to specific geographic areas.  *Id*. at 853.  The Court further commented on the additional difficulties regarding the functioning of the Internet in this context, including the fact that Websites frequently consist of a number of Webpages that are then linked together under a common domain name or perhaps even to other Websites altogether.  *Id*. at 852-53.

The factual findings in *Reno* set the stage for additional complications for the CDA's successor statute, the Child Online Protection Act ("COPA").  Enforcement of COPA was initially enjoined by the district court on the grounds that restricting content on the Web that would be lawful if viewed by adults is not the least restrictive means of protecting minors.  *See Ashcroft v. American Civil Liberties Union* ("*COPA I*"), 535 U.S. 564, 572 (2002) (citing *American Civil Liberties Union v. Ashcroft*, 31 F.Supp.2d 473, 497 (E.D. Pa. 1999)).  On appeal, the Third Circuit sustained the injunction, but on different grounds.  *Id*. at 572-73 (citing *American Civil Liberties Union v. Reno*, 217 F.3d 162, 175 (3rd Cir. 2000)).  Rather than conducting the extensive First Amendment inquiry undertaken by the district court, the court of appeals instead relied solely upon COPA's use of community standards to invalidate the law.  "Because 'Web publishers are without any means to

limit access to their sites based on the geographic location of particular Internet users,' the Court of Appeals reasoned that COPA" was likely unconstitutional.  *Id.*

In a highly splintered opinion, the Supreme Court reversed this finding.  *COPA I*, 535 U.S. 564.  A three-justice plurality comprised of Justices Thomas, Rehnquist, and Scalia ruled that the use of localized community standards to define what is harmful to minors on the Internet does not violate the First Amendment.  *Id.* at 585.  Although concurring in the result, Justice O'Connor wrote separately to advocate a national standard in online obscenity prosecutions.  *Id.* at 586-87.  Also agreeing with the result was Justice Kennedy, joined by Justices Ginsburg and Souter, who reasoned that additional fact-finding regarding the scope of COPA's prohibitions was necessary to determine how large a problem the Act's use of community standards presented.  *Id.* at 592-93.  Only Justice Stevens believed, on the record presented to the court of appeals, that the community standards issue was sufficient to warrant a preliminary injunction.  *Id.* at 603.

On remand, the court of appeals once again upheld the injunction against COPA.  *See American Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003).  This time, the court of appeals undertook the extensive review of COPA it had failed to conduct in its first opinion.  It noted numerous constitutional deficiencies with the law, including not only the community standards problem it had discussed earlier, but also the inability of material on the Internet to be taken as a whole.  *Id.* at 252-53; 270.  Also fatal to the statute was the fact that it was not the least restrictive means available to protect children from harmful online material, given that filters and parental oversight would prove equally, if not more, effective without suppressing speech that is lawful for adults.  *Id.* at 264-65.

The case once again traveled to the Supreme Court.  *See Ashcroft v. American Civil Liberties Union* ("*COPA II*"), 542 U.S. 656 (2004).  This time, the Court upheld the injunction by majority vote.  In a line of analysis similar to the Third Circuit's reasoning in *COPA I*, the Court dispensed with the numerous constitutional flaws outlined by the courts below and instead focused on a single problem that served to invalidate the statute: the availability of filters as a less restrictive means of obtaining the government's goals. *Id*. at 660-61.  Given that Internet technology had likely changed since the district court's initial fact-finding in 1999 and the Court's decision in 2004, the Court remanded the case to allow the government to present additional evidence on the reliability of filters. *Id*. at 671, 673.  Also of note was a strong concurring opinion by Justice Stevens, joined by Justice Ginsburg, that chastised criminal prosecutions as "an inappropriate means to regulate the universe of materials classified as obscene, since the line between communications which offend and those which do not is too blurred to identify criminal conduct."  *Id*. at 675-76 (Stevens, J., concurring) (citations omitted).

On remand, both the district and appellate courts again invalidated COPA as unconstitutional. *See American Civil Liberties Union v. Mukasey* ("*COPA III*"), 2008 WL 2801759, at * 1, 25 (3d Cir. July 22, 2008).  Again the Third Circuit emphasized the myriad constitutional deficiencies that permeate COPA, including the inapplicability of the "as a whole" and community standards components of *Miller* to the World Wide Web.  *Id*. at *23 ("we agree with the District Court's conclusion that COPA's use of the phrase[] ... "as a whole" ... renders it vague"); *id*. at *24 (noting that COPA's use of local community standards, thereby reducing the range of suitable speech online to what is accepted by the most puritanical community, exacerbates its overbreadth). Notably, the Supreme Court's decision in *COPA II* did not address the Third Circuit's reasoning

6

regarding either the "taken as a whole" or the community standards issues.  Accordingly, the Third

Circuit's second COPA decision remains intact, a fact specifically observed by that court in its most

recent opinion.  *See COPA III*, 2008 WL 2801759, at \*5-6, 24 (discussing application of law of the

case doctrine to history of COPA decisions).  It is within this backdrop that this Court must analyze

the constitutional issues presented by the government's prosecution of online material here.

> **B.    The Court Should Dismiss the Pending Charges against JS Inc.
> on the Grounds that 47 U.S.C. § 223(d) and 14 U.S.C. § 1465
> Unconstitutional as applied to the Internet.**

>> **1.    The *Miller* test's requirement that the charged material be
>> taken as a whole is impossible in the context of the World
>> Wide Web.**

The Supreme Court's most recent ruling on the definition of obscenity came over three

decades ago in *Miller v. California*, 413 U.S. 15 (1973).  Under *Miller*, a particular work can only

be declared obscene, and therefore devoid of First Amendment protection, in the narrow

circumstance where: 1) the average person, applying contemporary community standards, would

find that the work, ***taken as a whole***, appeals to the prurient interest, which is generally defined as

a morbid or shameful interest in sex; 2) the work depicts or describes, in a patently offensive way,

sexual conduct as specifically defined by the applicable state law; and 3) the work, ***taken as a whole***,

lacks serious literary, artistic, political, or scientific value.  *Miller*, 413 U.S. at 24.

In the context of traditional obscenity prosecutions involving print material or video, there

has been little debate over what constitutes "the whole" for the purposes of the first and third prongs

of *Miller*.  Courts have almost universally concluded that, where photographs in a larger publication

are alleged to be obscene, the text that surrounds the images must also be considered.  *See, e.g.,*

*United States v. Miscellaneous Pornographic Magazines*, 526 F.Supp. 460, 466 (N.D. Ill. 1981)

(requiring Dutch text in allegedly obscene publication to be translated so that jury could evaluate material as a whole); *see also United States v. Thevis*, 484 F.2d 1149, 1155-57 (5th Cir. 1973) (holding that six of twelve magazines were not obscene because significant portions of literary matter accompanied pictures that, taken alone, would satisfy obscenity test).  In a similar vein, courts have also held that videos charged as obscene must also be considered in their entirety to determine whether they appeal to a prurient interest and are without redeeming value.  *See, e.g., United States v. Toushin*, 714 F.Supp. 1452, 1460-61 (M.D. Tenn. 1989).

The issue becomes more complicated when online material is the subject of an obscenity prosecution.  As foreshadowed in *Reno*, it is an impossible task to determine what constitutes the whole on the Internet, when all Web content is interconnected.  *See Reno*, 521 U.S. at 853.  Unlike traditional media, "[l]inks from one computer to another, from one document to another across the Internet, are what unify the Web into a single body of knowledge, and what makes the Web unique." *American Civil Liberties Union v. Reno*, 919 F.Supp. 824, 836-37 (E.D. Pa. 1996), *aff'd* 521 U.S. 844 (1997).  The Supreme Court has compared the World Wide Web to "both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services."  *Reno*, 521 U.S. at 851.  For that reason, Justice Kennedy explained in his *COPA I* that it was "unclear whether what is to be judged as a whole is a single image on a Web page, a whole Web page, an entire multiple Web site, or an interlocking set of Web sites."  *COPA I*, 535 U.S. at 593 (Kennedy, J., concurring).  He therefore suggested that, on remand to the Third Circuit, it would be "essential to answer the vexing question of what it means to evaluate Internet material 'as a whole,' when everything on the Web is connected to everything else."  *Id*. at 600 (internal citations omitted).

8

The Third Circuit responded by discussing the question in detail. *See Ashcroft v. American Civil Liberties Union*, 322 F.3d 240, 252-253 (3d Cir. 2003). First, the court observed that COPA defined "material" to include "'*any* communication, picture, image file, article, recording, writing, or other matter of any kind,'" such that a single image on a single Web page could violate the law. *Id*. at 252 (citing 47 U.S.C. § 231(e)(6)) (emphasis in original). The court then viewed this expansive definition to "mandate[] evaluation of an exhibit on the Internet in isolation, rather than in context." *Id*. at 253. In the Third Circuit's opinion, this approach is particularly problematic because an image considered in its proper context may no longer appeal to the prurient interest or lack serious value. *Id*. Exclusion of context thus destroys the ability of the fact-finder to properly evaluate the material under the *Miller* test as modified for minors. *Id*.

This holding renders not only COPA, but also the federal obscenity statutes, invalid as applied to computerized communications. In the same way that COPA permits a single image from a Website to be criminalized if communicated to minors, § 223(d) and § 1465 are being applied in this case to isolate a short video excerpt from the additional and perhaps less offensive content provided on the same Website. The plain language of the statute permits this result. By defining the material eligible for prosecution to include a discrete quantum of items, including a single "comment, request, suggestion, proposal, image, or other communication," § 223(d) precludes consideration of context. The statute therefore suffers from the same constitutional defect as COPA and as its predecessor, the CDA, which was invalidated in *Reno*, 521 U.S. at 853. As applied here, the challenged law prohibits consideration of the material taken "as a whole," a necessary and essential requirement for the first and third prongs of the *Miller* test. The statutes are therefore

unconstitutional as applied and cannot form the basis of a valid prosecution, particularly in light of the Supreme Court's decision in *Reno*.

> 2.     **The *Miller* test's reliance upon community standards to determine whether a particular work is obscene is unworkable in an online environment.**

The statutes at issue are additionally invalid as applied to the Internet because they effectively limit speech suitable for adults throughout the country based upon the community standards of the most puritanical region.  Like the "as a whole" conundrum, this argument also draws its support from the Third Circuit's decision invalidating COPA.  *Ashcroft*, 322 F.3d at 270.  Although the Supreme Court initially disagreed with the Third Circuit and found that "COPA's reliance on community standards to identify 'material that is harmful to minors' does not *by itself* render the statute substantially overbroad for purposes of the First Amendment," it did not dissolve the preliminary injunction that barred enforcement of the law.  S*ee COPA I*, 535 U.S. 564 (emphasis in original).  On remand, the circuit court determined that the community standards issue may not be sufficient  by itself to strike the statute, but that it could be considered as a factor in assessing the law's constitutionality.  *See Ashcroft*, 322 F.3d at 270.  To that end, the Third Circuit found COPA impermissibly overbroad based in part upon its use of the term "community standards" to restrict speech on the Internet.  *Id*.  By "'essentially requir[ing] that every Web publisher subject to the statute abide by the most restrictive and conservative state's community standards in order to avoid criminal liability,'" COPA mandates that every Internet speaker who could conceivably be covered by its provisions self-censor their expression based upon the attitudes of the least tolerant community.  *Id*. (citing *American Civil Liberties Union v. Reno*, 217 F.3d 162 (3d Cir. 2000)).  This

violates the First Amendment by reducing the range of speech that can be communicated and accessed by adults online. *Id.*

Much like COPA, the *Miller* definition, which governs both § 1465 and § 223(d)'s criminalization of obscenity, also mandates that the possible obscenity of a piece of work be assessed based upon community standards. *See* 47 U.S.C. § 223(d)(1). While this definition makes logical sense when a speaker directly and purposefully communicates his message to or in a particular community, the term becomes unworkable when applied to Internet communications that can neither be directed at, nor limited to, a specific geographic region. *See Reno*, 521 U.S. at 853. As applied to this case, the community standards element raises the identical overbreadth concerns addressed in *Ashcroft*. Because the Website which houses the clips can be viewed from anywhere in the country, or for that matter, anywhere in the world, it is impossible for the content provider to limit his speech to a certain area or to restrict those living in certain regions from accessing it. *Ashcroft*, 322 F.3d at 270; *Reno*, 521 U.S. at 853. As such, a significant risk exists that the clips might be deemed obscene by a jury in one city or geographic region but found acceptable by a jury in another city or state. As the *Ashcroft* court observed, this risk renders the statutes fatally flawed. *Id.*

The federal government's attempt to sanitize the Internet, both through legislative enactments and through the initiation of prosecutions such as this one, may receive popular support. That said, however, the government may not impinge upon protected constitutional rights in the name of law enforcement. *See, e.g., United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 818, 826 (2000) (finding that government cannot restrict speech "even with the mandate or approval of a majority"). In light of the Third Circuit's most recent COPA decision, the United

11

States is attempting to do here indirectly what it could no longer do directly after *Reno* – prosecute commercial Internet content providers for making sexually explicit programming available online. This prosecution is riddled with constitutional difficulties, particularly given the Third Circuit's invalidation of the "taken as a whole" and "community standards" prongs of the obscenity test as applied to the World Wide Web. The only appropriate remedy in these circumstances is dismissal of counts three and seven.

### 3.    18 U.S.C. §§ 1462 and 1465 are  impermissibly overbroad.

Principles of due process prohibit laws that are overbroad in scope by requiring that laws refrain from punishing unintended, innocent, or constitutionally protected conduct. *See Broderick v. Oklahoma*, 413 U.S. 601, 613 (1973); *Coates v. City of Cincinnati*, 402 U.S. 611 (1971). Pursuant to this protection, a law is facially void for overbreadth if it "does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that ... constitute an exercise" of constitutionally-protected expression. *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). The statutory language may be very clear, yet "sweep unnecessarily broadly to invade the areas of protected freedoms." *Record Revolution #6, Inc. v. City of Parma*, 638 F.2d 916, 927 (6th Cir. 1980). In this manner, an overbroad statute enacts a chilling effect on constitutionally protected or otherwise lawful conduct. *Id.* Laws which are overbroad and threaten the exercise of First Amendment rights are therefore unconstitutional. *Broadrick*, 413 U.S. 601.

The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate all enforcement, unless a limiting construction so narrows the statute as to entirely remove the chilling effect on protected expression. *See Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003). In determining whether such a

limiting construction exists, the federal courts must be wary of engaging in judicial rewriting of

statutes. *See, e.g., Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988).  Only where

a narrowing construction is "readily available" may courts authoritatively construe a statute to

render it constitutional. *See Reno*, 521 U.S. at 884.  The Third Circuit recently elaborated on the

reason for this policy:

> As the Supreme Court once noted, "It would certainly be dangerous
> if the legislature could set a net large enough to catch all possible
> offenders, and leave it to the courts to step inside and say who could
> be rightfully detained, and who should be set at large.  This would,
> to some extent, substitute the judicial for the legislative department
> of the government."

*Ashcroft*, 322 F.3d at 270 (citing *United States v. Reese*, 92 U.S. 214, 221 (1875)).

Use of the term "lewd" to define criminal conduct creates the impermissible risk that

constitutionally protected speech will be criminalized. *See Conchatta, Inc. v. Miller*, 458 F.3d 258

(3d Cir. 2006).  At issue in *Conchatta* was whether the Pennsylvania Liquor Code's prohibition of

lewd conduct in licensed liquor establishments was impermissibly overbroad.  Ruling that it was,

the court relied heavily on the fact that the statute targeted not only nude dancing, which is at the

outer ambit of the First Amendment, but also applied to more legitimate artistic entertainment

presented at movie theaters, concert halls, and live performance venues. *Id*. at 266.  There being no

readily available narrowing construction of the term "lewd," the statute clearly swept within its

coverage material immune from prosecution. *Id*. at 265-66.

The *Conchatta* court was not the first court to invalidate use of the term "lewd" to punish

speech-related offenses.  For example, the Southern District of Texas invalidated a similar phrase

in a Texas liquor license restriction because it exceeded the scope of what could be considered

legally obscene. *See Carico Investments, Inc. v. Texas Alcoholic Beverage Comm'n*, 439 F.Supp.2d

733, 749 (S.D. Tex. 2006).  Similarly, a local restriction on lewd conduct was stricken in *City of Seattle v. Johnson*, 58 Wash.App. 64, 68, 791 P.2d 266, 269 (Wash. Ct. App. 1990), because it could be applied to constitutionally protected expressive dance performances.  Other state and federal courts have reached identical conclusions.  *See, e.g., J.L. Spoons, Inc. v. City of Brunswick*, 181 F.R.D. 354 (N.D. Ohio 1998); *Louisiana v. Carter*, 388 So.2d 802, 803 (La. 1980) (finding a state statute prohibiting lewd dancing void for vagueness because it might reach more than obscene dancing).

Much like the statute at issue in *Conchatta* and the other overbreadth cases cited above, the federal obscenity statutes under which JS Inc. is charged criminalize conduct that is "lewd."[1]  It is true that the indictment charges JS Inc. only with distributing obscenity, and not lewd material. However, given the chilling effect that overbroad laws impose on speech, JS Inc. has standing to challenge the statutes as being overbroad as to the speech of others.  *See Conchatta*, 458 F.3d at 263.

As was the case in *Conchatta*, the term "lewd" is undefined in the federal obscenity statutes, creating the impermissible risk that it could refer to any material that is sexually oriented or

---

[1] 18 U.S.C. § 1465 states in pertinent part:

> Whoever knowingly transports or travels in, or uses a facility or means of, interstate or foreign commerce or an interactive computer service ... in or affecting such commerce for the purpose of sale or distribution of any obscene, **lewd**, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, case, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined under this title or imprisoned not more than five years, or both.

(Emphasis added).  In addition, 18 U.S.C. § 1462 also describes the offense of "importation or transportation of obscene matters" by referencing the term "lewd."  *See* 18 U.S.C. § 1462(a)-(b).

offensive to a sensitive subset of the population.[2]  Of particular concern is the fact that the federal obscenity statutes have no savings clause for material that might qualify as lewd, but still maintain serious artistic, scientific, or educational value.  Such a clause has been judicially engrafted onto the obscenity portion of the statute, but that definition does not apply to the remaining terms in the obscenity laws.  *See Miller*, 413 U.S. 15.  As such, any material a particular United States Attorney might find objectionable, from such critically acclaimed works of literature as *Romeo and Juliet* and *The Catcher in the Rye* to Academy Award-winning films like "Titanic" and "The Accused," is at risk of being prosecuted.

Having demonstrated that the obscenity statutes are overbroad to the extent they apply to "lewd" and other undefined objectionable material, the question then becomes whether those terms can be excised from the statute so as to render it constitutional.  As discussed *supra*, courts must be cautious in construing statutes so as not to invade upon the province of the legislative branch.  *See, e.g., American Booksellers*, 484 U.S. at 397.  That caution, if properly applied here, demonstrates that there is no "readily available" limiting construction that would properly reflect the intent of Congress.  *See Reno*, 521 U.S. at 884.  It is clear from the plain language of the statutes that Congress intended to criminalize the distribution of a wide range of material beyond that which can be declared legally obscene.  *See* 18 U.S.C. § 1465 (applying to every "obscene, **lewd**, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, case, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character") (emphasis added).  That Congress has amended

---

[2]The remaining undefined terms in the statutes, such as "lascivious," "indecent," "filthy," and  "vile," also create an impermissible risk of overbroad application in the same manner as use of the term "lewd."  *See* 18 U.S.C. §§ 1462, 1465.

the statutes in question after *Miller* but left the objectionable terms intact only solidifies this conclusion. *See, e.g.,* Pub. L. 104-104, § 507 (1996). To remove the offending terms from the statute would not only deviate from the legislature's clearly expressed intentions, but would also amount to judicial rewriting by elimination. The Court should therefore strike down the obscenity statutes in their entirety as unconstitutionally overbroad and should dismiss the pending charges against JS Inc. on this basis.

II.    **In The Alternative, The Court Should Issue A Pretrial Ruling Regarding The Applicability Of The *Miller* Test To This Prosecution.**

      A.    **The Material to be Taken as a Whole in Counts Three and Seven is the Entire www.evilangel.com Website.**

As discussed above, the *Miller* test's requirement that the charged material be taken as a whole for the purposes of determining its appeal to the prurient interest and whether it nevertheless retains serious value creates constitutional difficulties when applied to the World Wide Web. This is due to the inevitable interconnectedness of material on the Internet. As Justice Kennedy observed in his concurring opinion in *COPA I*, it is conceivable that the "whole" on the Internet could constitute a single Web page, an entire Web site, or a linked set of Web sites or pages. *See COPA I*, 535 U.S. at 593 (Kennedy, J., concurring).[3] Thus, given the peculiar functioning of the Internet, "it is essential to answer the vexing question of what it means to evaluate Internet material 'as a whole,' when everything on the Web is connected to everything else." *Id*. at 600.

The Third Circuit's response to this "vexing question" was to invalidate COPA root and branch. *See Aschroft*, 322 F.3d 240. Central to this holding was the court's determination that

---

[3]Interestingly, because the Court's opinion in *COPA I* was so fractured, Justice Kennedy's concurrence garnered exactly as many votes as the portion of the plurality opinion discussing the community standards problem.

COPA criminalizes discrete items taken out of context. *Id.* at 252-53. Although the federal obscenity statutes suffer from the same defect, this Court could alleviate the obvious First Amendment concerns by ruling that the "whole" to be considered for the purposes of assessing obscenity is the entire Evil Angel Website. To do so would permit the jury to consider not only the allegedly obscene video clips, but also the entire context within which they were presented on the Web.

**III.    The Pending Obscenity Charges Against JS Inc. Must Be Dismissed Because the Statutes Under Which Those Charges Were Brought Violates The Constitutional Substantive Due Process Guarantee.**

Although the United States Constitution does not explicitly guarantee a right of privacy, the Supreme Court, in a series of various factual and legal settings, has gradually recognized that the right to privacy is a constitutionally protected liberty interest embodied in the Due Process Clause of the Fourteenth Amendment. Substantive due process principles have been utilized by the Supreme Court to strike down state laws restricting or prohibiting liberties in a wide array of contexts, including: (1) the right to marry, *Loving v. Virginia*, 388 U.S. 1 (1967); (2) the right to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); (3) the right to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 39 (1923); *Pierce v. Society of Sisters*, 268 U.S. 390 (1925); (4) the right to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479 (1965); (5) the right to use contraception, *id; Eisenstadt v. Baird*, 405 U.S. 438 (1972); (6) the right to bodily integrity, *Rochin v. California*, 342 U.S. 165 (1952); (7) the right to have an abortion, *Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992); (8) the right to refuse unwanted lifesaving medical treatment, *Cruzan*

*v. Dir. of Mo. Dept. Of Health*, 497 U.S. 261 (1990); and, most recently, (9) the right to engage in homosexual behavior, *Lawrence v. Texas*, 539 U.S. 558 (2003).

For at least the past eighty years, this concept of a right to privacy as an integral part of substantive due process and constitutionally protected liberty has existed to restrain the reach of government into the personal lives of the people. As early as 1923, the Supreme Court noted that:

> [w]hile this court has not attempted to define with exactness the liberty thus guaranteed [by the Due Process Clause of the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Meyer*, 262 U.S. at 399. Since that time, substantive due process has evolved to specifically include a right of privacy in the sanctity of the home, a right of sexual privacy for unmarried persons, a right of privacy to make choices regarding childbirth, a right of privacy in the body, and ultimately a right of consenting adults to make all choices regarding sexuality without fear of prosecution. As society's perception of and attitudes toward sexuality have become more tolerant, so have the Courts' interpretation of the Due Process Clause in this context. The liberties guaranteed by substantive due process have moved out of the marital bedroom and into the public sphere of commercial interactions and private interactions between consenting adults. As the Supreme Court stated in the opening lines to its landmark decision in *Lawrence*:

> Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And *there are other spheres of our lives and existence, outside the home, where the State should not be*

> *a dominant presence. Freedom extends beyond spatial bounds.*
> *Liberty presumes an autonomy of self that includes* freedom of
> thought, belief, expression, and *certain intimate conduct.*

*Lawrence*, 539 U.S. at 562 (striking down Texas's homosexual sodomy laws as an unconstitutional violation of liberty under substantive due process) (emphasis added). Furthermore, as Justice Scalia scathingly noted in his dissent, the holding and the logic of *Lawrence* calls into question all state laws based simply upon traditional "morals," including, he states, "state laws against . . . obscenity." *Id*. at 590 (Scalia, J., dissenting). In other words, *Lawrence* "effectively decrees the end of all moral legislation. If, as the Court asserts, the promotion of majoritarian sexual morality is not even a legitimate state interest, *none of the above-mentioned laws [including obscenity laws] can survive rational basis review*." *Id*. at 599 (emphasis added).

Thus, the Supreme Court has explicitly recognized that the right of privacy derived from the Due Process Clause is no longer confined–if it ever was–solely to the sanctity of the home. Rather, the Court suggested, "liberty of the person [involves] both . . . spatial and more transcendental dimensions." *Id*. at 562. Furthermore, in striking down Texas's sodomy law, the Court reiterated that, "[i]t is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Id*. at 578 (quoting *Planned Parenthood*, 505 U.S. at 847). In light of the Supreme Court's holding in *Lawrence*, as well as the liberalization of both society's attitudes regarding adult sexuality in general and court rulings on this subject in particular, this Court should reconsider and reevaluate the federal pandering obscenity laws and should ultimately hold that such laws violate the substantive component of liberty guaranteed by the Due Process Clause.

A.     **The Courts Have Evolved to Recognizing a Right to Sexual Privacy under Substantive Due Process.**

A substantive due process right to sexual privacy, as interpreted by the courts, can be traced back at least as far as the 1960s, in cases involving the right to possess and use contraceptives.[4]  For example, in *Griswold v. Connecticut*, 381 U.S. 479 (1965), the Supreme Court invalidated a state statute that criminalized the sale of contraceptives.   The Court held that this statute unconstitutionally invaded the right of privacy of married couples in the marital bedroom, a "right of privacy older than the Bill of Rights–older than our political parties, older than our school system."  *Id*. at 486.   The opinion of the Court focused on a zone of privacy created by the penumbras of several fundamental guarantees, including the First, Third, Fourth, Fifth, and Ninth Amendments to the Constitution.  *Id*. at 483-85.   Justice Harlan's and Justice White's separate concurrences, however, argued vehemently that this right of privacy was to be found in the Due Process Clause of the Fourteenth Amendment.  *Id*. at 500, 502; *see also, Poe v. Ullman*, 367 U.S. 497, 522 (1961) (Harlan, J., dissenting).   Several years later, in *Eisenstadt v. Baird*, 405 U.S. 438 (1972), the Court extended this right to include within its scope certain decisions regarding sexual conduct by non-married persons.   Although the decision to strike down the law prohibiting distribution of contraceptives to unmarried persons was premised on the Equal Protection Clause, the Court also recognized that the law impaired the exercise of a fundamental personal right of

---

[4]Under some theories, including that espoused on occasion by the Supreme Court, a general constitutional right of privacy can be found as early as the beginning of the Republic, as implicitly embodied in the Bill of Rights.  *See, e.g., Griswold*, 381 U.S. at 485 (finding a right to privacy in the penumbras of various Amendments); *Mapp v. Ohio*, 367 U.S. 643, 656 (1961) (holding that the Fourth Amendment creates a "right to privacy, no less important than any other right carefully and particularly reserved to the people").   As outlined above, a right to privacy in areas outside sex was explicitly recognized as part of substantive due process as early as 1923.

privacy in this context: "If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id*. at 453 (emphasis added). The substantive due process right of sexual privacy was thus explicitly recognized.

The *Griswold* and *Eisenstadt* opinions formed the basis for the landmark decision in *Roe v. Wade*, 410 U.S. 113 (1973), which struck down a Texas abortion statute primarily on the basis that the law violated the woman's right of privacy as derived from the Due Process Clause. The Court stated: "*[t]his right of privacy,* whether it be *founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is,* or . . . in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id*. at 153 (emphasis added). However, the Court noted that this "fundamental right" to privacy was not absolute, and that the "compelling state interest" in protecting the health of the mother and the potential human life could justify a state's limitations on the right to an abortion at later stages of the pregnancy. *Id* at 153-63.

In *Carey v. Population Services International*, 431 U.S. 678 (1977), the Supreme Court held unconstitutional a New York state law prohibiting the distribution of contraceptives to anyone under sixteen years of age, prohibiting the display or advertisement of contraceptives, and the distribution of contraceptives by anyone other than a pharmacist. In striking down this law, the Court explicitly stated that the personal privacy rights involving marriage, procreation, contraception, family relationships, child rearing, and child education all derived from the liberty interest inherent in the Due Process Clause. *Id*. at 684-685. Importantly, the Court noted that a "*total prohibition against the sale* of contraceptives, for example, *would intrude upon individual decisions* in matters of

21

procreation and contraception *as harshly as a direct ban on their use*" and that "*the same test must be applied* to state regulations that burden an individual's right . . . by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely...*because such access is essential to the exercise of the constitutionally protected right*." *Id*. at 687-88 (emphasis added).

The Supreme Court further expounded upon these concepts in *Planned Parenthood*, 505 U.S. at 851, stating:

> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

The Supreme Court's jurisprudence in this area of sexual privacy had thus evolved, in the space of less than twenty years, from a tentative right of married couples in the privacy of their own bedroom to a right involving almost all matters of personal and private sexual decisions, of married and unmarried persons, adults and minors, and the right to define one's own sexual existence.

As noted above, the Supreme Court's most recent substantive due process decision, involving the Court's invalidation of a Texas sodomy statute, expanded this concept even further by suggesting that practically all choices made by consenting adults regarding their own sexual practices are a matter of personal liberty beyond the reach of state control. *See Lawrence*, 539 U.S. 558. The Court determined that "the case should be resolved by determining whether the petitioners were free as adults to engage in the private conduct on the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Id*. at 564. In answering this

question in the affirmative, the Court held that "petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of government." *Id*. at 578.

In suggesting that the majority may not enforce its own views of morality on the whole of society through criminal sanctions without some compelling justification, the Court reiterated its belief that "*[o]ur obligation is to define the liberty of all, not to mandate our own moral code*." *Id*. at 571 (quoting *Planned Parenthood*, 505 U.S. at 833) (emphasis added). Moreover, in overruling *Bowers v. Hardwick*, 478 U.S. 186 (1986), a prior case that had upheld a Georgia's anti-sodomy statute, the *Lawrence* Court noted that the history and tradition of sexual control by the state were in fact more ambiguous and complicated than previously thought; in this vein, the Court stated that "[h]istory and tradition are the starting point but not in all cases the ending point of substantive due process inquiry." *Lawrence*, 558 U.S. at 572 (citation omitted). In "defining the liberty of all," the Supreme Court ultimately ruled that the government could not prohibit consensual sodomy because the private sexual practices of adults are protected from interference by the substantive due process guarantee. *Id*. at 571. Again, "[i]t is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Id*. at 578. That realm of personal liberty should not be invaded by the states in their misguided attempt to impose the majority's morals through laws prohibiting the distribution of obscenity.

**B.    The Fundamental Right to Sexual Privacy Should Encompass the Right to Possess Allegedly Obscene Materials and a Correlative Right to Sell and/or Purchase Such Materials.**

It is now a matter almost beyond dispute that sexual privacy is an integral component of the liberty guaranteed by the Due Process Clause. However, laws against the possession and distribution of allegedly obscene materials remain an anomaly in this context, and the constitutionality of these laws must be revisited in light of the long line of substantive due process decisions culminating in *Lawrence*.

In *Stanley v. Georgia*, 394 U.S. 557 (1969), the Supreme Court ruled that "the mere private possession of obscene matter cannot constitutionally be made a crime." *Id.* at 559. Although the Court referred several times to the fundamental right to be free from governmental intrusions into one's privacy, it did not base its decision on any notion of liberty protected by substantive due process *per se*. Rather, the Court based its decision on the freedom of speech and of press as guaranteed by the First and Fourteenth Amendments. *Id.* at 565. Despite the Court's insistence in *Stanley* that a state may not prohibit obscene material possessed in the privacy of the home, the Supreme Court has been unwilling in the past to acknowledge a correlative right to receive, transport, distribute, mail, or sell such materials. *See, e.g., United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123 (1973); *United States v. Orito*, 413 U.S. 139 (1973); *United States v. Reidel*, 402 U.S. 351 (1971); *United States v. Thirty-Seven Photographs*, 402 U.S. 363 (1971); *accord Williams v. Attorney General of Alabama*, 378 F.3d 1232 (11th Cir. 2004); *United States v. Extreme Associates*, 531 F.3d 150, 161-62 (3d Cir. 2005) (reversing district court's ruling that federal obscenity statutes violate substantive due process on grounds of *stare decisis* without reaching ultimate merits of constitutional challenge).

24

Again, the Supreme Court's recent decision in *Lawrence* (as well as the approximately thirty years of liberalization regarding the legality and acceptance of sexual practices that has occurred both society-wide and in the courts) demands reconsideration of those cases rejecting a substantive due process challenge to obscenity laws. As the Court noted in *Lawrence*, there is "*an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex.*" *Id*. at 572 (emphasis added).

In fact–even before *Lawrence* was decided–some state supreme courts and federal district courts had already extended the right of sexual privacy and substantive due process to include a right to buy and sell allegedly obscene materials. For example, in striking down a state pandering obscenity statute, the Supreme Court of Hawai'i held that "*[s]ince a person has the right to view pornographic items* [defined in terms of obscenity] at home, *there necessarily follows a correlative right to purchase such materials* for this personal use, or the underlying privacy right becomes meaningless." *State v. Kam*, 69 Haw. 483, 495, 748 P.2d 372, 380 (1988) (declined to follow and extend by *State v. Mallan*, 86 Haw. 440, 950 P.2d 178 (1998)) (emphasis added).

Although the Hawai'i Supreme Court based its *Kam* decision largely on the Hawai'i Constitution's right to privacy, later cases from the Hawai'i Supreme Court have noted approvingly of the Constitutional Convention's Committee report that this right to privacy is "similar to the privacy right discussed in [federal] cases such as *Griswold v. Connecticut*, *Eisenstadt v. Baird*, *Roe v. Waid*, etc." and have stated that "the federal cases cited by the Convention's committee of the whole should guide our construction of the intended scope of article I, section 6." *Mallan*, 86 Haw. at 444, 950 P.2d at 182 (citations omitted). Because the right to privacy encompasses the right to read or view obscene materials in the home, the Hawai'i Supreme Court reasoned, the state cannot

25

interfere with the right to purchase such materials for use in the home unless a compelling state interest in demonstrated.  *Id*.

The essential holding in *Lawrence* was recently echoed by the Fifth Circuit in *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008).  At issue in *Reliable* was the validity of Texas' obscene devices statute, which criminalizes the sale and distribution of marital aids that are marketed or used for genital stimulation.  *Id*. at 740-41.  Broadly interpreting *Lawrence* to protect "not simply a right to engage in [a] sexual act itself, but instead a right to be free from governmental intrusion regarding 'the most private human contact, sexual behavior,'" the court ruled that a ban on commercial distribution of sexual devices was tantamount to a prohibition on the individual right to private sexual conduct.  *Id*. at 744.  In the court's view, the state's concern for promoting public morality – whether viewed under strict scrutiny or less exacting rational basis review – is wholly insufficient to justify such a ban.  *Id*. at 744-45.

Much like the statute at issue in *Reliable*, the federal obscenity statutes compromise the protected right to sexual privacy by denying adult consumers access to sexual explicit material in the commercial marketplace.  Such an intrusion is neither justified nor mitigated by moral concerns. This Court should therefore apply the reasoning of *Lawrence* and *Reliable* and should ultimately invalidate the obscenity statutes under which JS Inc. is charged.

**C.    This Court Should Declare the Federal Obscenity Statutes Unconstitutional.**

The right to privacy derived from the substantive due process guarantees of the Fifth and Fourteenth Amendments presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct.  It protects the individual from unwarranted government intrusions into private places.  This situs of this privacy right has moved out of the strict confines

of the marital bedroom and into private interactions between consenting adults and even commercial transactions. It involves the liberty of the person in its spatial as well as its more transcendent dimensions. The right of sexual privacy has evolved as society's attitudes about sexuality have evolved. Liberty now gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex. This protection is broad enough to encompass a right to buy and sell obscene materials.

As defined by *Lawrence* and its precursors, the substantive due process right to privacy demands a reconsideration of whether the federal obscenity statutes are facially valid. And this liberty demands that the laws be declared unconstitutional. As the *Lawrence* Court noted, "[t]he doctrine of *stare decisis* is essential to the respect accorded to the judgments of the Court and to the stability of the law. It is not, however, an inexorable command." *Lawrence*, 539 U.S. at 577. When a law violates the Constitutional rights of the people, it must be overturned. The federal obscenity laws violate the right to sexual privacy as derived from the Due Process Clause and as defined by *Lawrence*. As the Supreme Court stated in that landmark decision:

> Had those who drew and ratified the Due Process Clauses of the Fifth and Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

*Id*. at 578-79. JS Inc. seeks nothing more than to invoke those principles of liberty that already exist. And according to those principles, the indictment should be dismissed.

**IV.    Conclusion**

For the foregoing reasons, the Court should dismiss the pending charges against Defendant

John Stagliano, Inc. in their entirety.

Respectfully submitted,


   /s/ Robert Corn-Revere

Robert Corn-Revere (D.C. Bar No. 375415)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-3402
Telephone: (202) 973-4200
Telecopier: (202) 973-4499

H. Louis Sirkin (Ohio Bar No. 0024573)
Jennifer M. Kinsley (Ohio Bar No. 0071629)
Sirkin, Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
Telephone: (513) 721-4876
Telecopier: (513) 721-0876

Counsel for Defendant John Stagliano, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing document was provided via the Court's electronic filing notification system upon Pamela Satterfield, U.S. Department of Justice, on the 31st day of July, 2008.

<div style="margin-left: 40%;">

_/s/ Robert Corn-Revere_

Robert Corn-Revere (D.C. Bar No. 375415
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-3402
Telephone: (202) 973-4200
Telecopier: (202) 973-4499

Counsel for Defendant John Stagliano, Inc.

</div>

29

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              :

      Plaintiff,                                    :          Case No. 1:08-CR-00093-RJL

      v.                                              :          Judge Leon

JOHN STAGLIANO, et al.                        :

      Defendants.                              :

**PROPOSED ORDER GRANTING
DEFENDANT JOHN STAGLIANO, INC. S
MOTION TO DISMISS INDICTMENT**

For good cause shown, Defendant John Stagliano Inc.'s Motion to Dismiss Indictment, is hereby granted. For the reasons set forth in Defendant's Motion to Dismiss Indictment and the supporting memorandum, 18 U.S.C. §§ 1462, 1465, and 1466 and 47 U.S.C. § 223(d) are unconstitutional and Defendant cannot be charged with their violation. All counts of the indictment are accordingly dismissed.

      IT IS THEREFORE ORDERED.

Judge Richard J. Leon
United States District Court for the District of Columbia

30

To be served upon:

Pamela Satterfield
U.S. Department of Justice
Obscenity Prosecution Task Force
1301 New York Avenue, NW
Suite 500
Washington, DC 20530

Robert Corn-Revere
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 200, Washington, DC 20006-3402

H. Louis Sirkin
Jennifer M. Kinsley
Sirkin, Pinales & Schwartz LLP
105 W. Fourth Street, Suite 920
Cincinnati, OH 45202

Paul Cambria
42 Delaware Avenue, Suite 300
Buffalo, NY 14202-3901

Allan Gelbard
15760 Ventura Boulevard, Suite 801
Encino, CA 91436